**David Pfeffer**
**Richard Schoenstein**
**Attorneys for Plaintiffs**
**Tarter Krinsky & Drogin LLP**
**1350 Broadway**
**New York, New York 10018**
**(212) 216-8075**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADAM BLANK, individually and as trustee of the ADAM BLANK 2012 GRAT, ACKER FAMILY 2012 GIFT TRUST and ACKER FAMILY 2013 GIFT TRUST, | CIVIL ACTION NO.: 1:17-cv-876-ALC ECF CASE |
| Plaintiffs, | |
| v. | AMENDED COMPLAINT AND JURY DEMAND |
| TRIPOINT GLOBAL EQUITIES, LLC, TRIPOINT CAPITAL ADVISORS, LLC, MARK H. ELENOWITZ and MICHAEL BOSWELL, | |
| Defendants. | |

Plaintiffs, Adam Blank ("Blank"), Adam Blank 2012 GRAT, Acker Family 2012

Gift Trust and the Acker Family 2013 Gift Trust (collectively "Plaintiffs"), by their

attorneys, allege the following against defendants, Tripoint Global Equities, LLC

("Tripoint Global"), Tripoint Capital Advisors, LLC ("Tripoint Advisors"), Mark H.

Elenowitz ("Elenowitz") and Michael Boswell (collectively "Defendants"):[1]

---

[1] The allegations herein are based upon information and belief, except for those allegations as to Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based on the investigation of its counsel, including review of: (i) the complaint in United States v. Simmons and Meli, 17 MAG 647 (S.D.N.Y. 2017), sworn to by A. Kurgansky, Special Agent of the Federal Bureau of Investigation and approved by E. Kobre, Assistant United States Attorney; (ii) the complaint in SEC v.

## SUMMARY OF ALLEGATIONS

1.      This action concerns a Ponzi scheme whereby the United States contends – by way of criminal and SEC cases pending before this Court – that Joseph Meli, Steven Simmons, Matthew Harriton and their corporate entities[2] (collectively "Ponzi Operators") variously raised "approximately $81 million from at least 125 investors located in 13 states, for purported investment in ticket reselling enterprises involving high profile events including the Broadway musical *Hamilton*.  The [Ponzi Operator] Defendants diverted at least $51 million of the incoming investor funds to perpetuate a Ponzi scheme and to enrich themselves."[3]

2.      As discussed herein, Defendants made repeated false and misleading statements to Plaintiffs that they conducted reasonable, adequate and necessary due diligence and investigations regarding the Ponzi Operators and the health, management, governance and financial condition of the purported ticket business.

3.      Defendants promised that they would be "trusted advisors" to Plaintiffs on these and potential other investments.  Elenowitz told Blank that Defendants would forgo commissions on Plaintiffs' investments to establish a long term relationship.

---

Meli, Harriton, et al., 1:17-cv-00632 (S.D.N.Y. 2017); (iii) SEC 'Form D' filings documenting that, "[TriPoint Global] will be receiving cash fees based upon the amount of gross proceeds received by the Issuer in connection with transactions introduced by such broker;" (iv) SEC and FINRA filings documenting that TriPoint Global is registered with the SEC as a 'Broker-Dealer' but that Tripoint Advisory is not registration; and (v) press releases by the SEC and the US Attorney's Office.

[2] The Ponzi Operators' entities include 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC and Advance Entertainment II, LLC.

[3] SEC v. Meli, Harriton, et al., 1:17-cv-00632 (S.D.N.Y. 2017).

4.      Defendants' false representations and material omissions were intended to and did convince Plaintiffs to make investments in the supposed ticket business totaling $1,500,000.

5.      Instead of undertaking a reasonable review – or the "necessary due diligence and investigation" represented by Defendants – of the Ponzi Operators and their ticket reselling business, Defendants focused on seizing their own commissions and continued to persuade Plaintiffs and apparently others to make even more investments, resulting in the misappropriation of $1,500,000 from Plaintiffs, as well as significant sums from other victims.

6.      A reasonable investigation into the Ponzi Operators and their purported ticket business would have revealed the presence of numerous 'red flags' that would have alerted a prudent person to conduct further inquiry into the Ponzi Operators alleged business activities.  The abject failure of Defendants to reasonably investigate, combined with their knowing misrepresentations and omissions, as well their blatant but undisclosed conflict of interest, led directly to the monetary damages sustained by Plaintiffs.  This action is brought to recover those damages and otherwise hold Defendants to account for their misconduct.

## PARTIES

7.      Plaintiff, Blank, is an individual residing in Nassau County, New York.

8.      Plaintiff, Adam Blank 2012 GRAT, is a duly formed and existing grantor retained annuity trust.  Blank is a duly appointed and authorized trustee of the Adam Blank 2012 GRAT.

9.      Plaintiff, Acker Family 2012 Gift Trust, is a duly formed and existing family gift trust.  Blank is a duly appointed and authorized trustee of the Acker Family 2012 Gift Trust.

10.     Plaintiff, Acker Family 2013 Gift Trust, is a duly formed and existing family gift trust.  Blank is a duly appointed and authorized trustee of the Acker Family 2013 Gift Trust.

11.     Defendant, Tripoint Global is a limited liability company, duly organized and existing by virtue of the laws of the State of Maryland with it principal place of business at 1450 Broadway, 26th Floor, New York, New York.

12.     Tripoint Global is authorized to conduct business in the State of New York and is registered with the SEC as a broker-dealer.

13.     Defendant, Tripoint Advisors is a limited liability company, duly organized and existing by virtue of the laws of the State of Maryland with its principal place of business at 1450 Broadway, 26th Floor, New York, New York.

14.     Tripoint Advisors is *not* authorized to conduct business in the State of New York and is *not* registered with the SEC as a broker-dealer.

15.     Defendant, Elenowitz, is an individual residing in Nassau, New York.

16.     Elenowitz, is the senior principal and Chief Executive Officer of Tripoint Global and Tripoint Advisors and their unincorporated affiliate BANQ.  Elenowitz is a graduate of the University of Maryland School of Business and Management with a B.S. in Finance and reportedly holds Series 24, 62, 63, 79, 82 and 99 licenses. Elenowitz is the recipient of several entrepreneurial awards and has been profiled in

BusinessWeek, Inc Magazine, CNBC and Bloomberg, as well as several other publications.

17.     Defendant, Boswell, is an individual having a residence and professional office in New York, New York.

18.     Boswell is co-founder, President, Chief Operating Officer and Chief Compliance Officer of Tripoint Global.  He is also a Managing Director of Tripoint Advisors.  Boswell is currently CFO of Mission Solutions Group, a privately held defense sector company and General Technologies Corp, a privately held technology company. He was previously CFO of Ocean Smart International and has advised numerous public companies on accounting and valuation issues.  Prior to the founding of Tripoint, Boswell held a number of executive positions focusing on business development and management consulting. He also spent eight years as a senior analyst and senior engineer. Mr. Boswell earned a M.B.A. from Johns Hopkins University and a B.S. degree in Mechanical Engineering from University of Maryland and reportedly holds the Series 24, 62, 63, 79, 82 and 99 licenses.

19.     Boswell is the registered agent and/or organizer for most of the numerous Tripoint entities.

20.     Tripoint Global and Tripoint Advisors are owned and/or managed by three principals:

    **(i) Elenowitz** - Founder and Primary Principal of Tripoint Global and Tripoint Advisors;

**(ii) Boswell** - Founder and Chief Operating and Compliance Officer at

Tripoint Global and Managing Director of Tripoint Advisors; and

**(iii) Louis Taubman** - Founder and Member of Tripoint Advisors,

responsible for managing all legal matters and General Counsel of Tripoint

Global.  Taubman is also the managing partner of the New York office of Hunter

Taubman Fischer.[4]

21.     Elenowitz, Boswell, Taubman along with the Tripoint Global, Tripoint

Advisors, and Taubman's law firm (Hunter, Taubman, Fischer & Li LLC) all work out of

the same offices on the 26th Floor of 1450 Broadway, New York, New York.

22.     Each Tripoint principal has and uses the same contact information,

including mailing address, telephone number and cellular telephone number, whether

working for TriPoint Advisors, Tripoint Global or Hunter, Taubman, Fischer & Li LLC.

23.     Tripoint Advisors and Tripoint Global have the same telephone number

listed on their websites and marketing material.

24.     Tripoint Advisory and Tripoint Global also claim to share offices in the

same suite in Washington, D.C. located at 400 Professional Drive, Suite 310.  The

Tripoint entities reference this location as an actual business office and even go so far as

to give maps to its location on their websites.  However, like many things related to

Tripoint, 'Suite 310' appears to be little more than a drop box, corporate services office or

---

[4]   This is not the first case where Tripoint entities, Taubman and their law firm have been accused of having a
conflict of interest and not disclosing the relationships between said parties.  In Tripoint Global Equities, LLC
v. Fasolino, 1:13-cv-01030-DLC (S.D.N.Y. 2013), the plaintiff alleged that certain Tripoint entities were
related and that "[a]t no time did either Weiss or any representative of Tripoint Global Equity or Hunter,
Taubman Weiss LLP ever advise [Plaintiff] that they were related or in any way involved with each other."
See, Amended Answer, Third Party Complaint, May 27, 2013.

the office for Boswell's company Mission Solutions Group.  A 'Google' search revealed many different entities in the same Suite 310.

25.     Further review of the Defendants business activities reveal that the Defendants use and have used the Washington, D.C. address to form and register numerous other Tripoint entities including:

| Company Name | Agent / Organizer |
|---|---|
| Tripoint Las Vegas I, LLC | Michael Boswell |
| Tripoint Global Equities, LLC | Michael Boswell |
| Tripoint Capital Management, LLC | Michael Boswell |
| Tripoint Real Estate Holdings, LLC | Mark H. Elenowitz |
| Tripoint Entertainment Consumer Products, LLC | Michael Boswell |
| Tripoint Insurance Solutions, LLC | Michael Boswell |
| Tripoint Fitness Productions, LLC | Michael Boswell |
| Tripoint Entertainment, LLC | Mark H. Elenowitz |

26.     In deliberately creating an organization whereby the various Tripoint entities – owned and/or managed by the same three principals – which all offer, sell and provide services in varying and conflicting financial businesses (e.g., financial advisory services, broker-dealer promotions/sales as well as legal services), under the same roof on the 26th Floor of 1450 Broadway, the Defendants have intentionally created an opaque but unified organization devoted to obtaining fees and commissions without regard to the principals of law, disclosure, conflicts and regulatory responsibilities.

27.     Defendants' opaque and mingled organization coupled with their repeated

material misrepresentations and lack of reasonable diligence caused Plaintiffs to lose

$1,500,000 to the Ponzi Operators' ticket resale scheme.


## JURISDICTION AND VENUE

28.     Federal jurisdiction is predicated on: (a) 28 U.S.C. § 1331 because the action

arises under the laws of the United States; and (b) 28 U.S.C. § 1367 because the Court has

supplemental jurisdiction over those claims that form part of the same case or controversy as

claims within the Court's original jurisdiction.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c)

because a substantial part of the events or acts giving rise to the claim occurred in this

Judicial District and because Defendants conduct business in this District.


## SUBSTANTIVE ALLEGATIONS

**The Parties' First Meeting –**
**Tripoint Represents Itself as a "Trusted Advisor,"**
**Fortified by the Acumen of its Three Principals**

30.     On or about January 11, 2016 at the Sage Bistro restaurant in Woodbury,

New York, Blank and Elenowitz met for the first time to discuss the possibility of

developing a business relationship whereby Defendants would assist Plaintiffs in finding

investment opportunities and Defendants would provide financial advisory and related

services to Plaintiffs in order to review, investigate, evaluate and make recommendations

with respect to such potential investment opportunities.  Elenowitz told Blank at their first

meeting that he "and Tripoint regularly assist their clients in analyzing and investigating

potential investment opportunities, were 'trusted advisors' to their clients and that Tripoint

could bring and recommend different and varied investment opportunities to the [Plaintiffs]."

31.   At this first meeting, Elenowitz told Blank that he "should take a look at the three Tripoint websites, including Tripoint Advisory, Tripoint Global and BANQ."  Blank reviewed Tripoint's websites and relied upon such the information, especially how Tripoint explains – starting on the home page – that they provide "Trusted Advice" and have "specialized practices in capital markets, advisory, corporate consulting… corporate governance and compliance services."

32.   The background of the three key founders and principals of both Tripoint Advisors and Tripoint Global, as represented in detail on both Tripoint websites, include a corporate lawyer, a compliance officer and Elenowitz himself, who all represent that they have "extensive financial services" experience, including "investigative services." Elenowitz states that he "provides investigative services for Board of Directors, Special Committees and public companies [and] serves as an expert witness in FINRA arbitrations and court actions."  Plaintiffs relied on these representations, which ultimately formed a basis for Plaintiffs to gain trust in the Defendants and their investments recommendations.

33.   Boswell, who like all three key principals, holds various positions at both Tripoint firms including founder, member, President and Chief Compliance Officer. Boswell represents on the Tripoint website that he has varied experience with the "implications of various SEC rules and FASB Emerging Issues Task Force issues as they relate to private placements, SEC reporting and disclosure requirements…."

34.   Taubman states that he is a founder and member of Tripoint Advisors and General Counsel of Tripoint Global.  He also says that he "provides counsel to issuers and

underwriters with regard to public and private finance, securities registration… periodic
reporting under the Securities Exchange Act of 1934… and corporate governance issues."
Taubman also says on the Tripoint website that he is a member of the Lesser, Hunter
Taubman law firm.  This law firm is now known as Hunter Taubman Fischer & Li LLC,
where Taubman states on the firm's website that he "manages HTFL's office [and his]
practice concentrates on securities law, corporate finance and corporate governance."
Only upon counsel's investigation did Blank learn that Hunter Taubman Fischer & Li LLC
is located in the same offices as the Tripoint firms.

35.     During the initial meeting and many subsequent telephone calls, Blank
repeatedly advised Elenowitz that he "had no appetite for high risk investments, especially
since [Blank] is a trustee of various trusts [including those named in this Amended
Complaint] and that due diligence and safe investments would be the primary
considerations in determining whether [Plaintiffs] would authorize the trusts to make
investments with Elenowitz and his entities."

**Elenowitz Presents the Ticket Resale Business
and Represents that he and Tripoint Conducted
Investigations and Diligence of the
Ticket Resale Business and its Operators**

36.     At the January 11, 2016 meeting and subsequent conversations thereafter,
Elenowitz told Blank about the Tripoint firms, their partners and their care in reviewing
investments and focus on protecting their clients and investors.  Elenowitz told Blank
about various investment opportunities and again represented that any investment would
"fully meet [Plaintiff's] stated requirements, were conservative and entirely appropriate for
[Plaintiffs]."  Most importantly, Elenowitz again represented to [Blank] that he and "the

10

Tripoint entities, including [Tripoint's] compliance team, which include an experienced corporate attorney and investment banking division, conducted an investigation and complete due diligence on every proposed investment."

37.     During the initial meeting and repeated subsequent telephone calls, Blank again explained to Elenowitz that "given their young ages and the investment criteria of the [Plaintiffs], it was important that all investments – *but most especially the first investment to be recommended by [Defendants]* – be something that was fully vetted and recommended based on [Plaintiffs'] investment criteria of review, due diligence and safety."  Elenowitz assured Plaintiffs that "the first investment would be as conservative as possible to cement their future relationship."

38.     In response, Elenowitz advised and recommended to Blank that "the safest and most conservative investment was the ticket resale business."  Elenowitz explained to Blank that "the investment was a 'no-brainer' because the guys who run the ticket resale business had a deep understanding of the event business, were able to acquire 'inside' and pre-sale access to the most desirable events and that, what [Elenowitz] liked most, was the fact that each investment was for stated event(s) with each having an extremely short investment life."

39.     Elenowitz also represented to Blank that "the entire Tripoint due diligence team, including attorney [Taubman], who serves Tripoint's clients like [Blank], loved the way the ticket resale investment documents were drafted."  Elenowitz told Blank, specifically, that the Tripoint team "loved the profit participation provisions as they were extremely favorable to investors in that it benchmarked 'preference percentages' and 'remainder percentages.'"

11

40.    At the same meeting, Elenowitz further represented to Blank that he "personally knew the owners of the ticket resale business, that [Elenowitz] met with them regularly, as did the Tripoint compliance and investments teams."  Elenowitz also represented to Blank that he had conducted due diligence regarding the ticket resale business.  Specifically, Elenowitz said that he "personally reviewed and analyzed the ticket resale companies' financial statements and business records to ensure that all corporate governance was handled appropriately including ensuring that the operators were handling financial and related issues in a customary and prudent manner."

41.    Elenowitz further represented to Blank that "two of his partners were personally invested in the ticket resale business along with many of Tripoint's clients who has been investors since the inception of the ticket resale business, always receiving the promised returns."  Elenowitz told Blank that he "was pleased to present [Plaintiffs] with an opportunity to invest in the ticket resale business because it would give [Elenowitz and Tripoint] an opportunity to show demonstrate what [the Defendants] could do for the [Plaintiffs]."

42.    Summing up his feelings about the situation – supposedly gleaned from his own firm's due diligence and relationships with the principals – Elenowitz represented to Blank that [Plaintiffs] "can't lose with this investment."

**Blank's Specific Queries Regarding**
**Potential Risks and Losses**

43.    During the initial meeting and repeated subsequent telephone calls, Blank still had concerns and asked Elenowitz additional specific questions regarding the ticket business as well as potential risks and losses.  Such questions included, but were not limited to:

> **- Blank asked Elenowitz "to explain why [Plaintiffs] 'couldn't lose?'"**

Elenowitz responded to Blank that, *"[Plaintiffs] couldn't lose because, in addition to all of the other things, the tickets had intrinsic value so they could always be sold at 'face value' since only the best seats were purchased and that the [Ponzi Operators] had special contracts with producers to obtain great seats, including for the show Hamilton."*

> **- Blank asked Elenowitz about "risks associated with a recession?"**

Elenowitz told Blank that, *"the investment is basically recession proof since there were always wealthy people to purchase the most sought after tickets."*

> **- Blank asked Elenowitz about "risks associated with talent, weather or other event cancellations?"**

Elenowitz responded by again explaining, in detail, how Tripoint conducted a full due diligence review and investigation, *"which revealed that the [Ponzi Operators] had purchased solid insurance in case of event cancellations and that all investors were fully covered should there be even one cancellation."*

> **- Blank asked Elenowitz to "confirm that he and Tripoint performed a full review and diligence related to the ticket resale business and its operators and that they were fully satisfied with the results."**

Elenowitz again confirmed to Blank that he and *"Tripoint reviewed and analyzed the ticket resale companies' financial statements and business records to ensure that all corporate governance was handled appropriately."* Additionally, and in specific detail, Elenowitz explained to Blank that "there was a data room to handle ticket orders and processing and that the Tripoint team reviewed the business records and relevant documents to support the purchase and sale of the millions of dollars of event tickets."

**Elenowitz' Continued Representations to Blank**
**Prior to and Following Plaintiffs' Initial Investments**
**and the "Tripoint Business Model"**

44.     Prior to Plaintiffs agreeing to make the first of several investments in the ticket resale business, Elenowitz again represented to Blank – and at various times between Januray through December 2016 – that "[Elenowitz] would continue to have [Blank's] back and make sure that every investment was fully and completely vetted, reviewed and investigated before [Elenowitz] and Tripoint would make a recommendation to [Plaintiffs] to make any invest."

45.     From January through December 2016, Elenowitz continued to contact and make representations to Plaintiffs that the Defendants "were specially situated to safeguard Plaintiffs' investments." Elenowitz told Blank that "[Elenowitz] and the Tripoint entities were uniquely positioned to assist" Plaintiffs since – as documents on the Tripoint

Advisors website – "each of the firm's principals has developed, managed, operated, and worked with new businesses and rapidly growing and evolving organizations."

46.     Additionally, Elenowitz represented to Blank in detail how the 'Tripoint Business Model' works to establish a "trusted advisor" relationship whereby the "[Defendants] investigate, evaluate and continually monitor potential and active investments, while having the unique ability to deliver a constant flow of new and fully vetted investments to Plaintiffs."

47.     Between January and December, 2016, Elenowitz advised Blank – both in person and over the phone – that "such protection and opportunities would not be possible without the 'Tripoint Business Model' of an experienced team of three key professionals working together to ensure that all investments were fully vetted and investigated and that there would be regular evaluations concerning the issuer's representations about them."

48.     This was possible because, as represented by Defendants and discussed on Defendants' own websites and marketing material the importance of the three primary principals of the Tripoint entities:

     (i)  *Elenowitz* serves as the CEO/Director of both Tripoint Global and Tripoint Advisors and would be responsible for all activities, advice and recommendations made to Plaintiffs;

     (ii) *Boswell* serves President and Chief Compliance Officer of Tripoint Global as well as a founder and Managing Director of TriPoint Advisors.  Defendants advised Plaintiffs that Boswell would provide high-level financial, investigative and compliance services to Plaintiffs; and

**(iii)** *Taubman* was a founder of serves as a member of Tripoint Advisors as well as General Counsel to the broker-dealer Tripoint Global.  Additionally, Defendants represented to Plaintiffs that – "as counsel to both issuers and underwriters with regard to public and private finance, securities registration under the Securities Act… [and experienced with] M&A transactions and corporate governance issues" – Taubman and his firm, Hunter Taubman Fischer, "was, in fact, at Tripoint" to evaluate issuer representations and provide regular legal analysis and compliance review.  Elenowitz also pointed Blank to a Tripoint website which said that Tripoint had a "strategic alliance" with Taubman's firm, Hunter Taubman Fischer.  Elenowitz told Blank that Taubman and his firm were literally down the hall in the same offices as Tripoint in order to provide a full array of services to help all of Tripoint's relationships "grow successfully and consistently," as the Tripoint website claims.

49.     Indeed, the Defendants' own website and marketing material, sent to via the United States postal service, state that "Tripoint maintains relationships with a wide-range of professionals and other securities industry sources, such as investment bankers, other broker-dealers, accountants, attorneys and financial professionals and consultants …. Very few firms can offer the access, expertise, and targeted corporate financial experiences that we can deliver to our clients."

50.     Defendants operate as one singular financial consulting entity along with their affiliates to fabricate a convincing patina of a trusted advisor by, among other things, directing "clients on market acceptance, valuation, timing and structure of equity offerings."

51.     Notably, Elenowitz never expressly represented to Plaintiffs that Tripoint
Global was a licensed broker-dealer that was receiving commissions for soliciting
investors into the Ponzi Operators' scheme.  In fact, Tripoint Advisors does not have a
broker-dealer license and Elenowitz represented to [Blank] on numerous occasions that
"all of the Tripoint entities worked together on the same floor along with a law firm that
served to protect Tripoint's clients."  Elenowitz told Blank that the Defendants would
forgo commissions on Plaintiffs' investments to establish a long term business and
investment relationship.

52.     Immediately prior to Blank making his first investment into the ticket resale
business, Elenowitz represented to Blank that he "was able to get [Blank] into the two best
and most sought after ticket funds that were offered (*Hamilton* and Adele) but only if
[Blank] also invested in the 'Main Fund.'  Consequently, Blank invested a total of
$300,000 which would be split equally between the '*Hamilton* Fund,' the 'Main Fund,'
and the 'Desert Trip Fund.'"

53.     On or about March 14, 2016, and in reliance on Elenowitz' repeated and
various material representations, material omissions and recommendations, Blank (on
behalf of himself, personally) made his first investment of $300,000 into the three ticket
funds.

54.     From March through December 2016, Blank regularly checked in and spoke
with Elenowitz, who continued to assure Blank that "the ticket business was in great
shape, the [Plaintiffs'] investments were sound even though some reports came in late and
that he and Tripoint continues to recommend the ticket business investment to clients and
investors."

17

55.     Additionally, Elenowitz repeatedly advised Blank that "regular review of the ticket business was performed by [Elenowitz] and Tripoint" and assured Blank "that Tripoint's continued review revealed absolutely no concern or red flags."

56.     Plaintiffs relied on all of these representations including the material on Tripoint's websites in deciding to continue to take Defendants' recommendation and invest in the ticket business.

57.     On or about August 10, 2016, and in reliance on Elenowitz' representations and continued assurances to Plaintiffs from January to August 10, 2016, the Plaintiffs made the following investments into the Ponzi Operators' scheme: (i) Adam Blank - $100,000; (ii) Adam Blank 2012 GRAT - $100,000; (iii) Acker Family 2012 Gift Trust - $500,000; and (iv) Acker Family 2013 Gift Trust - $500,000.  Blank made these subsequent investments because of and in reliance on Elenowitz' continued representations and assurances.

58.     With respect to Plaintiffs' investments with the Pozni Operators (which collectively totaled $1,500,000 and made on March 16, 2016 and August 10, 2016), Defendants continually represented to Blank from January through December 2016, that they "had reviewed, performed extensive due diligence and investigated the Ponzi Operators' business activities and continued to regularly monitor the Ponzi Operators' and their ticket business, including: investigating the Ponzi Operators' representations; applying financial and accounting tests to verify receipts and the subject ticket business activities; reviewing and analyzing evidence in support of the claims, forecasts and representations in the Ponzi Operators' investment documents; and examining the Ponzi

Operators' books and records; attending regular meetings to "check in" with the Ponzi Operators and to monitor business activity and performance."

59.     From January through December 2016, Defendants repeatedly represented to Plaintiffs that "numerous and continuing investigations were accomplished by the experienced professionals at the Tripoint companies."

60.     In order to convince Plaintiffs to invest in the Ponzi Operators' ticket business and to make additional investments – in what the United States is now claiming to be a Ponzi scheme – the Defendants continually represented to Plaintiffs that their various companies and relationships (including law firms) would act in unison to provide Plaintiffs with "continued review, oversight and investigation" of Plaintiffs' investments and that Defendants integrated team of trusted financial professionals and advisors would also lead to additional lucrative investment opportunities.

61.     Unfortunately for Plaintiffs and the other victims introduced by Defendants to the ticket Ponzi scheme, the investigations and diligence that Defendants represented were performed, were either not performed or not reasonably undertaken with respect to the Ponzi Operators and their purported ticket resale business.  As such, Defendants had no reasonable basis whatsoever to recommend that Plaintiffs make investments with the Ponzi Operators.

62.     Plaintiffs reasonably relied on the Defendants' misrepresentations and material omissions in deciding to invest in the ticket resale scheme.

63.     Defendants' misrepresentations and fabricated model of "Trusted Advice" in conjunction with Defendants' known failure to conduct a reasonable review and investigation of the Ponzi Operators and their business caused the misappropriation of

millions of dollars that Defendants raised from over fifty investors; $1,500,000 of which belonged to the Plaintiffs.

64.     Plaintiffs seek to recover their economic damages, legal fees and other relief as set forth below including all fees and other amounts wrongfully paid to the Defendants.

**PLAINTIFFS' CLAIMS**

**COUNT I**

**NEGLIGENCE**
**Against all Defendants**

65.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

66.     Defendants owed Plaintiffs a duty to perform reasonable investigations in recommending the investments to Plaintiffs, a duty to disclose conflicts related to Defendants' various business entities and interests as well as a duty to exercise reasonable care in the advice and recommendations made to Plaintiffs.

67.     Defendants' conduct as described throughout this Amended Complaint was negligent.  Among other things, Defendants breached their duty to act with reasonable care by, among other things, not advising Plaintiffs that they were acting as a promoter for the Ponzi Operators and taking fees and commissions from them for recommending the ticket resale business investments and, as discussed above, Defendants' recommendations were contrary to Plaintiffs' stated investment objectives.

68.     The Defendants also breached their duties to Plaintiff:

     a.     By not undertaking a reasonable investigation of the Ponzi Operators;

     b.     By not investigating the Ponzi Operators' claims;

20

c.     By not investigating the use and intended use of the proceeds received by the Ponzi Operators;

d.     By not tailoring a reasonable investigation of the Ponzi Operators;

e.     By not examining historical financial statements of the Ponzi Operators;

f.     By not contacting customers and suppliers regarding their dealings with the Ponzi Operators;

g.     By not inquiring and verifying the business affiliates of the Ponzi Operators including, but not limited to confirming that the Ponzi Operators had actual agreements with event promoters such as the producer of *Hamilton*;

h.     By not inquiring about internal audit controls of the Ponzi Operators;

i.     By not maintaining in its records documentation that it performed a reasonable investigation, including the results of their investigations;

j.     By not finding, noting and/or advising Plaintiffs of any "red flags" that would alert a prudent person to conduct further inquiry including, but not limited to, the Ponzi Operators' non-response and/or refusal to provide requested information;

k.     By retaining counsel and/or other experts to undertake its investigation who were conspicuously biased because of conflicts of interest including, but not limited to, such counsel and experts having a financial interest or incentive in vetting the Ponzi' Operators;

l.      By failing to advise Plaintiffs that the Defendants and their counsel and/or experts had a financial incentive in the procurement of Plaintiffs' investments with the Ponzi Operators;

m.      By receiving commissions and compensation from the Ponzi Operators in relation to Plaintiffs' investments after Elenowitz told Blank that Defendants would forgo commissions and compensation on Plaintiffs' investments to establish a long term relationship;

n.      By failing to advise Plaintiffs of Defendants various conflicts of interests between Elenowitz, Tripoint Advisors, Tripoint Global, Taubman and his law firm; and

o.      By failing to refrain from having interests that were diametrically opposed to or otherwise in conflict with the interests of Plaintiffs including, but not limited to, operating Tripoint Advisory – a closely held (non-broker dealer) financial advisory firm, Tripoint Global – a closely held broker dealer firm owned and managed by the same three principals as Tripoint Advisory (both located at the same address with the same telephone numbers), and a founder/member/lawyer/law firm – Taubman – who represents Tripoints' clients.

69.     Plaintiffs would not have invested in the ticket resale business had Defendants exercised reasonable care with respect to their review, investigations, representations, recommendations and other conduct discussed herein.

70.     As direct and proximate result of the Defendants' negligence as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

## COUNT II

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)**
**Against all Defendants**

71.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth

herein.

72.     By reason of the conduct described above, Defendants, directly or

indirectly, in connection with the purchase or sale of securities, intentionally, knowingly

or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue

statements of a material fact or omitted to state a material fact necessary in order to make

the statements made, in the light of the circumstances under which they were made, not

misleading; and (iii) engaged in acts, practices, or courses of business which operated or

would operate as a fraud or deceit upon any persons, including purchasers or sellers of the

securities, such as Plaintiffs.

73.     Defendants, individually and in concert, directly and indirectly, by the use,

means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material information

about the Ponzi Operators, the ticket resale business and its operations, the Defendants to

failure to undertake a reasonable investigation into the Ponzi Operators and the ticket

resale business and future prospects as specified herein.

74.     Defendants employed devices, schemes, and artifices to defraud while in

possession of material adverse non-public information, and engaged in acts, practices, and

a course of conduct as alleged herein in an effort to assure Plaintiffs of the Ponzi

Operators' value and performance, which included the making of, or participation in the

making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Ponzi Operators and their business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the Plaintiffs.

75.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the financial risk of the ticket resale business.  As demonstrated by Defendants' omissions and misstatements of the ticket resale business, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading, including, but not limited to, undertaking a reasonable investigation of such business.

76.    At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth regarding the financial risk of the ticket resale business, which was not disclosed by Defendants, Plaintiffs would not have purchased or otherwise acquired their interest in the Ponzi Operators' purported business.

77.     By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

78.     As a direct and proximate result of the Defendants' conduct as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

## COUNT III

### Violations of Section 9(a)(4) and 9(f) of the Exchange Act
### Against all Defendants

79.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

80.     By virtue of the foregoing, Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the Ponzi Operators and the ticket resale business, and which Defendants knew or had reasonable ground to believe were so false or misleading.

81.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the Ponzi Operators and the ticket resale business, and which Defendants knew or had reasonable ground to believe were so false or misleading.

82.     By virtue of the foregoing, Defendants violated Section 9(a)(4) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a)(4) and 78i(f).

83.     As a direct and proximate result of the Defendants' conduct as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.


## COUNT IV

## NEGLIGENT MISREPRESENTATION
### Against All Defendants

84.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

85.     By reason of Defendants conduct described above, Defendants owed a duty to Plaintiffs to make true statements to Plaintiffs.

86.     As set forth above, Defendants' made repeated material statements and omissions of material fact that were false.

87.     Defendants should have known that such material statements and omissions of material fact that were false.

88.     Defendants knew that the statements and information supplied to Plaintiffs was for a serious purposes, namely to ascertain whether to make investment in the ticket resale business.

89.     Plaintiffs asked questions and listened intently to Defendants' representations because Plaintiffs intended to rely and act upon Defendants' statements, information and recommendations.

90.     Plaintiffs did reasonably rely on the false statements and information, to their detriment, by deciding to make several investments in the ticket resale business.

91.     As described above, Plaintiffs' reliance on Defendants' statements, representations and information caused significant, specific damage.

92.     As direct and proximate result of the Defendants' misrepresentations, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.


## COUNT V

### FRAUDULENT MISREPRESENTATION
### Against All Defendants

93.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

94.     By reason of Defendants conduct described above, Defendants owed a duty to Plaintiffs to make true statements to Plaintiffs.

95.     As set forth above, Defendants' made repeated material statements and omissions of material fact that were false.

96.     Defendants knew that such material statements and omissions of material fact that were false.

97.     By reason of Defendants conduct described above, Defendants owed a duty to Plaintiffs to make true statements to Plaintiffs.

98.     As set forth above, Defendants' made repeated material statements and omissions of material fact that were false.

99.     Defendants knew that such material statements and omissions of material fact that were false.

100.    Defendants knew that the statements and information supplied to Plaintiffs was for a serious purposes, namely to ascertain whether to make investment in the ticket resale business.

101.    Plaintiffs asked questions and listened intently to Defendants' representations because Plaintiffs intended to rely and act upon Defendants' statements, information and recommendations.

102.    Plaintiffs did reasonably rely on the false statements and information, to their detriment, by deciding to make several investments in the ticket resale business.

103.    As described above, Plaintiffs' reliance on Defendants' statements, representations and information caused significant, specific damage.

104.    As direct and proximate result of the Defendants' misrepresentations, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

**COUNT VI**

**UNJUST ENRICHMENT AND
ESTABLISHMENT OF A CONSTRUCTIVE TRUST
Against All Defendants**

105.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

95.    By reason of Defendants conduct described above, Defendants financially benefitted from their conduct and caused Plaintiffs to suffer injury and monetary loss.

96.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

97.    Each Defendant should pay its own unjust enrichment to Plaintiffs.

98.     Plaintiffs are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

99.     As a direct and proximate result of the Defendants' conduct as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

## COUNT VII

### MUTUAL MISTAKE
### Against all Defendants

100.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

101.     Defendants obtained fees and commissions related to Plaintiffs' investments in the ticket resale investments.

102.     Defendants were paid those fees and commissions under a mutual mistake of the parties as the ticket resale business was not a business but a Ponzi scheme.

103.     Plaintiffs demand recovery of those payments made pursuant to a mutual mistake from Defendants, jointly and severally.

## COUNT VIII

### PROMISSORY ESTOPPEL
### Against all Defendants

104.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

105.     As set forth above, Defendants' made repeated material statements and omissions of material fact that were false including, but not limited to, Defendants'

representations that they had and will continue to perform due diligence and continued

monitoring of Plaintiffs' investments.

106.   Plaintiffs reasonably and foreseeably relied upon Defendants' representations.

107.   As described above, Plaintiffs have suffered substantial damages in

connection with Defendants' material misrepresentations, omissions and failure to

perform their promises perform due diligence and continued monitoring of

Plaintiffs' investments.

108.   As a direct and proximate result of the Defendants' conduct as described

herein, Plaintiffs have suffered significant damages and Defendants should be estopped

from disputing the facts and claims set forth in this Amended Complaint.

**COUNT IX**

**BREACH OF FIDUCIARY DUTY**
**Against all Defendants**

109.   Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth

herein.

110.   A fiduciary relationship existed between Plaintiffs and Defendants, arising

out of Defendants' conduct, actions, and representations.

111.   Defendants' fiduciary duties to Plaintiffs arose from, among other things, its

representations that: (i) Defendants would assist Plaintiffs in finding investment

opportunities, and that they would provide Plaintiffs with financial advisory and related

services in order to review, investigate, evaluate and make recommendations with respect

to potential investment opportunities; (ii) Defendants would act as trusted advisors to

Plaintiffs; (iii) Defendants would take care in reviewing investments and focus on

protecting their clients and investors; (iv) all opportunities presented by Defendants would

30

fully meet Plaintiffs' stated requirements, were conservative, and entirely appropriate for Plaintiffs; and (v) Defendants would conduct an investigation and complete due diligence of every proposed investment.

112.   Defendants represented to Plaintiffs that they had extensive financial services experience, including the analysis and investigation of potential business opportunities.

113.   Based upon Defendants' representations, a special relationship of trust, confidence and loyalty existed between Plaintiffs and Defendants, establishing a fiduciary relationship between the parties.

114.   Defendants knew or should have known that Plaintiffs would rely upon their representations, advice and recommendations.

115.   Defendants had fiduciary duties of loyalty, trust, and confidence to act in Plaintiffs' best interests and provide Plaintiffs with advice in furtherance of Plaintiffs' interests.

116.   Defendants breached their fiduciary duties to Plaintiffs by, among other things: (i) failing to reasonably investigate or conduct due diligence of the Ponzi Operators; (ii) urging Plaintiffs to pursue investment opportunities that Defendants knew were in conflict with Plaintiffs' stated interests, were not conservative, and were not appropriate for Plaintiffs; and (iii) urging Plaintiffs' to pursue investment opportunities with the Ponzi Operators when Defendants failed to conduct reasonable investigations or due diligence of the Ponzi Operators and/or their investment opportunities.

117.   Defendants additionally breached their fiduciary duties by advancing their own interests over the interests of Plaintiffs and to Plaintiffs' detriment.

118.    Defendants advised Plaintiffs that they would forgo collecting commissions and compensation on Plaintiffs' investments.  Contrary to this representation, Defendants collected commissions on Plaintiffs' investments with the Ponzi Operators.   Upon information and belief, such interest motivated Defendants to push Plaintiffs to invest with the Ponzi Operators despite Defendants not conducting a reasonable investigation or due diligence.

119.    Plaintiffs would not have invested in the ticket resale business had Defendants fulfilled their fiduciary duties by exercising reasonable care with respect to their review, investigations, representations, recommendations and other conduct discussed herein.

120.    As direct and proximate result of the Defendants' breach of their fiduciary duties as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

## COUNT X

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
**Against all Defendants**

121.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

122.    Defendants committed deceptive and misleading acts, practices, and representations in the conduct of its business and performance of its services in the State of New York.

123.    Defendants misrepresent themselves to the public as trusted financial advisors that investigate, evaluate, and monitor potential and active investments for consumers.

124.    Defendants misrepresented themselves to Plaintiff as trusted financial advisors that investigate, evaluate, and monitor potential and active investments for consumers.

125.    Defendants misrepresent to the public that the collaboration and close relationship between Tripoint Advisors, Tripoint Global, a broker-dealer, and Taubman's law firm, Hunter Taubman Fischer & Li LLC, uniquely position Defendants to provide high-level financial services, including, but not limited to, evaluations, investigations, compliance services, recommendations, and legal analyses.

126.    Defendants misrepresented to Plaintiffs that the collaboration and close relationship between Tripoint Advisors, Tripoint Global, and Hunter Taubman Fischer & Li LLC, uniquely position Defendants to provide Plaintiffs with high-level financial services, including, but not limited to, evaluations, investigations, compliance services, recommendations, and legal analyses.

127.    Defendants do not provide the high-level financial services described herein to the detriment of and damage to public consumers.

128.    Defendants did not provide the high-level financial services described herein to the detriment of and damage to Plaintiffs.

129.    Defendants' deceptive and misleading acts, practices, and representations described herein represent Defendants' standard and routine practices.

130.    Defendants directed their deceptive and misleading acts, practices, and representations described herein to the public to impact their decisions whether to retain Defendants' services or do business with Defendants.

131.    Defendants' deceptive and misleading acts, practices, and representations are consumer-oriented.

132.    Defendants' deceptive and misleading acts, practices, and representations induced Plaintiffs to conduct business with Defendants and induced Plaintiffs to invest with the Ponzi Operators.

133.    Defendants' deceptive and misleading acts, practices, and representations affected the decisions of similarly situated consumers to retain Defendants' services, do business with Defendants, and/or to invest with the Ponzi Operators.

134.    Plaintiffs would not have done business with Defendants, retained Defendants' services, or invested with the Ponzi Operators but for Defendants' deceptive and misleading acts, practices, and representations described herein.

As direct and proximate result of the Defendants' deceptive and misleading acts, practices, and representations as described herein in violation of New York General Business Law § 349, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally, including actual damages, statutory damages, and reasonable attorneys' fees.


## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by a Jury on all issues triable by right of Jury.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a.      Awarding Plaintiffs the damages suffered as a result of the wrongs complained of herein together with appropriate interest;

b.      Declaring that Defendants have unjustly enriched themselves and imposing a constructive trust to recoup the Defendants' fees, unjust benefits and other assets for the benefit of Plaintiffs;

c.      Awarding Plaintiffs their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d.      Awarding Plaintiffs such other and further relief as may be just and proper under the circumstances.

Dated:   New York, New York
         March 21, 2017

TARTER KRINSKY & DROGIN LLP


By: /s/ David J. Pfeffer
    David Pfeffer
    Richard Schoenstein

1350 Broadway, 11th Floor
New York, New York 10018
Tel: (212) 216-8075
Fax: (212) 216-8001
dpfeffer@tarterkrinsky.com

*Attorneys for Plaintiffs,*
*Adam Blank, Adam Blank 2012 GRAT,*
*Acker Family 2012 Gift Trust and*
*Acker Family 2013 Gift Trust*

35